1  DAVID C. SHONKA
Acting General Counsel
2

3  KATHERINE WORTHMAN, DC Bar No. 488800
IOANA RUSU, DC Bar No. 1001603
4  Federal Trade Commission
600 Pennsylvania Avenue, NW
5  Mailstop CC-10232
Washington, D.C. 20580
6  Phone:  (202) 326-2929 (Worthman)
Facsimile:  (202) 326-3768
7  Email:  kworthman@ftc.gov (Worthman); irusu@ftc.gov (Rusu)
8

9  Colin Hector, CA Bar No. 281795
Federal Trade Commission
10  901 Market Street, Suite 570
San Francisco, CA 94103
11  Phone: (415) 848-5100
Facsimile: (415) 848-5184
12  Attorneys for Plaintiff
13  FEDERAL TRADE COMMISSION

14                    UNITED STATES DISTRICT COURT
15        FOR THE NORTHERN DISTRICT OF CALIFORNIA
                         San Francisco Division
16

17  FEDERAL TRADE COMMISSION,

18       Plaintiff,                      **Case No. _____**

19                                       **COMPLAINT FOR PERMANENT
          v.                             INJUNCTION AND OTHER
20                                       EQUITABLE RELIEF**

21  UBER TECHNOLOGIES, INC.,
     a Delaware corporation,
22
         Defendant.
23

24

25        Plaintiff, the Federal Trade Commission ("Commission" or "FTC"), for its Complaint

26  alleges:

27        1.       The FTC brings this action under Section 13(b) of the Federal Trade Commission

28  Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain temporary, preliminary, and permanent injunctive

**COMPLAINT**

1  relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement

2  of ill-gotten monies, and other equitable relief for Defendant's acts or practices in violation of

3  Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), in connection with its false, misleading, or

4  unsubstantiated claims regarding driver earnings and its Vehicle Solutions Program.

5  **JURISDICTION AND VENUE**

6      2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a),

7  and 1345, and 15 U.S.C. §§ 45(a) and 53(b).

8      3.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and

9  (d), and 15 U.S.C. § 53(b).

10  **INTRADISTRICT ASSIGNMENT**

11      4.      Defendant markets its services throughout the United States, including throughout

12  the county of San Francisco.

13  **PLAINTIFF**

14      5.      The FTC is an independent agency of the United States Government created by

15  statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a),

16  which prohibits unfair or deceptive acts or practices in or affecting commerce.

17      6.      The FTC is authorized to initiate federal district court proceedings, by its own

18  attorneys, to enjoin violations of the FTC Act and to secure such equitable relief as may be

19  appropriate in each case, including rescission or reformation of contracts, restitution, the refund

20  of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 56(a)(2)(A).

21  **DEFENDANT**

22      7.      Defendant Uber Technologies Inc. ("Uber" or "Defendant") is a Delaware

23  corporation with its principal place of business in San Francisco, California.  Defendant is a

24  mobile ride-hailing business and transacts or has transacted business in this district and

25  throughout the United States.

26

27

28

**COMPLAINT**                                                             **PAGE 2**

**COMMERCE**

8.      At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

**UBER'S BUSINESS ACTIVITIES**

**Overview**

9.      Uber distributes a mobile software application (the "App") that connects entrepreneurial consumers who are transportation providers (hereinafter "Uber Drivers" or "Drivers") with consumers seeking those services (hereinafter "passengers" or "customers"). Uber recruits and approves consumers to become Uber Drivers, sets the rates that Drivers charge for providing transportation, and collects a portion of the fares that Drivers charge for each ride. To maximize its revenue, Uber must amass a sufficient supply of Drivers to meet passengers' transportation demands.

10.      Since at least May 2014, to recruit consumers to drive for Uber, Uber has disseminated or caused to be disseminated advertisements encouraging consumers to become Uber Drivers on various websites, including but not limited to Craigslist.com and Uber's own website. In its advertisements, Uber claims that Uber Drivers can earn specific high hourly and yearly earnings. Notwithstanding these representations, in many instances Drivers have not earned the high earnings touted by Uber.

11.      Since at least November 2013, to further recruit Drivers, the company has offered an auto program, known as Uber's "Vehicle Solutions Program," which connects prospective Drivers with auto companies to buy or lease a vehicle they can use to drive for Uber. Uber has made numerous claims touting the low cost and unlimited mileage of its auto program, even though Uber has had no basis with which to make these claims. Indeed, the company has had no oversight of, nor has the company monitored, the terms and conditions of its Drivers' auto agreements through the Vehicle Solutions Program. Further, Drivers in Uber's Vehicle Solutions Program – which has connected Drivers with subprime auto companies and dealers –

**COMPLAINT**                                                                                           **PAGE 3**

1 have in many instances received worse than industry average rates, made payments for hundreds

2 of dollars more per month than advertised, and entered into leases imposing costs for mileage.

3     12.     Uber's earnings and auto claims have enticed numerous consumers to become

4 Uber Drivers and purchase or lease vehicles through Uber's Vehicle Solutions Program.  Based

5 on Uber's representations, consumers have paid at least $1,000 to enter into leases or retail

6 installment contracts for new or used vehicles at higher costs and worse terms than those

7 advertised.  When Uber's promised earnings have not materialized, and Drivers have attempted

8 to cancel their auto agreements, they have incurred significant monetary harm.  Uber has

9 collected significant revenues from its Drivers' fares, including tens of millions of dollars from

10 Drivers participating in the Vehicle Solutions Program.  Uber's practices have caused its Drivers

11 to suffer millions of dollars of injury.

12 **How Uber Works**

13     13.     Passengers book transportation services from an Uber Driver using a publicly

14 available version of the Uber App that can be downloaded to a smartphone.  When a passenger

15 submits a transportation request through the Uber App, the request is transmitted to the nearest

16 available Driver signed into the App.  Once a Driver has accepted a request, the App alerts the

17 customer of the Driver's name and vehicle information and facilitates passenger pick-up.

18 Following completion of the trip, Uber bills the cost of the trip to the customer.  Uber later remits

19 a portion of the amount it collects to the Driver, after deducting any fees that Uber collects.

20     14.     Uber offers multiple transportation service options to its customers, including a

21 relatively lower cost option called "uberX" as well as higher cost options such as "UberSelect,"

22 "UberBlack," and UberSUV."  The majority of Uber Drivers provide their own vehicles.

23     15.     For each service option available, Uber has set minimum standards that its

24 Drivers' vehicles must meet in order to qualify for use with Uber.  These standards vary per

25 service option and city.  For example, an uberX Driver in New York City must have a vehicle

26 that is model year 2010 or later and seats at least four passengers comfortably, while an

27 UberBlack Driver must have a 2010 or later luxury vehicle that seats at least six passengers

28 comfortably.  In San Francisco, an uberX vehicle must be model year 2001 or later and also must

**COMPLAINT**     **PAGE 4**

1   seat four passengers comfortably, while an UberBlack vehicle must be model year 2010 or later

2   and a luxury sedan that seats six people comfortably.

3          16.    Uber has classified its Drivers as independent contractors, not employees.

4   Drivers have paid all expenses associated with operating a car service, including using their own

5   cars and paying for all gas and tolls.

6          17.    Uber has set the Drivers' fares for each service option in each city based on

7   Uber's own formula, calculated using either a per-mile rate or a per-minute rate on top of a base

8   fare.  Uber charges a service fee for each trip, which Uber has calculated as a percentage of the

9   Drivers' total fare for the trip, usually 20%.  Prior to calculating its service fee, Uber also has

10  charged each Driver a one dollar "safe-rides" fee to cover the cost of screening Drivers and cars

11  for safety.  Uber has deducted these fees from the amount remitted to the Driver each week.

**Defendant's Earnings Claims**

13         18.    To induce individuals to become Uber Drivers, Uber has advertised and marketed

14  the earning potential of its Drivers on Craigslist, its company website, and other advertising and

15  marketing media.  Uber has publicized high annual and hourly earnings to entice consumers to

16  become Uber Drivers.  However, once Drivers have begun to receive their paychecks, Drivers

17  have discovered their actual earnings were substantially less than Uber has claimed.

18         19.    For example, from at least May 2014 until August 2015, Uber published a

19  statement from the CEO on its website titled, "An Uber Impact: 20,000 Jobs Created On The

20  Uber Platform Every Month."  In this post, Uber claimed that its uberX Drivers' "median income

21  is more than $90,000/year/driver in New York and more than $74,000/year/driver in San

22  Francisco."  Multiple news sources disseminated this statement, including Businessinsider.com,

23  CNBC.com, Forbes.com, and Slate.com.  In August 2015, Uber revised the CEO's entry on its

24  website so that the post reads: "[T]he potential income a driver on uberX can make in a year is

25  more than $90,000 in New York and more than $74,000 in San Francisco."

26         20.    Notwithstanding these representations, for at least the year preceding the CEO's

27  statement (May 2013-May 2014), the median uberX Driver in New York City earned $29,000

28  less annually than Uber claimed and the median uberX Driver in San Francisco earned $21,000

**COMPLAINT**                                                            **PAGE 5**

less annually than Uber claimed in its website post when Drivers' hours are standardized to a 40-hour work week.  Moreover, less than 10 percent of all Drivers in New York and San Francisco have earned the stated income.

21.     Uber has inflated its hourly Drivers' earnings in job listings as well.  For example, from at least January 2015 through March 2015, Uber represented in Craigslist advertisements that its Drivers make high hourly rates in cities across the country even when working flexible and part-time hours.  Specifically, Uber placed the following advertisements for Driver positions in various markets:

    a.  "Make $16/hour" in Atlanta, GA;

    b.  "Make $16/hour" in Baltimore, MD;

    c.  "Make $25/hour" in Boston, MA;

    d.  "Make $21/hour" in Chicago, IL;

    e.  "Make $15/hour" in Dallas, TX;

    f.  "Make $20/hour" in Denver, CO;

    g.  "Make $17/hour" in Houston, TX;

    h.  "Make $20/hour" in Los Angeles, CA;

    i.  "Make $16/hour" in Miami, FL;

    j.  "Make $18/hour" in Minneapolis, MN;

    k.  "Make $21/hour" in New Jersey;

    l.  "Make $20/hour" in Orange County, CA;

    m. "Make $25/hour" in Philadelphia, PA;

    n.  "Make $20/hour" in Phoenix, AZ;

    o.  "Make $20/hour" in San Diego, CA;

    p.  "Make $29/hour" in San Francisco, CA; and

    q.   "Make $21/hour" in Washington, DC.

22.     As with its website post, Uber's representations in these Craigslist advertisements overstate Drivers' earnings as higher than the median hourly earnings in these markets.  For example, Uber's data on hourly earnings indicates that, in Boston, Minneapolis, and,

**COMPLAINT**                                                                                              **PAGE 6**

Philadelphia, for the four weeks preceding January 5, 2015, for all Drivers in each of those cities, fewer than 10% of Drivers averaged Uber's promised hourly rate.  In 14 additional cities, for all Drivers in each of those cities, fewer than 30% of Drivers averaged Uber's promised hourly rate:

| City | Craigslist Advertisement Quoted Hourly Fare | Percent of Drivers Averaging Quoted Hourly Fare |
|---|---|---|
| Atlanta | $16 | Fewer than 30% |
| Baltimore | $16 | Fewer than 20% |
| Boston | $25 | Fewer than 10% |
| Chicago | $21 | Fewer than 20% |
| Dallas | $15 | Fewer than 30% |
| Denver | $20 | Fewer than 20% |
| Houston | $17 | Fewer than 30% |
| Los Angeles | $20 | Fewer than 20% |
| Miami | $16 | Fewer than 50% |
| Minneapolis | $18 | Fewer than 10% |
| New Jersey | $21 | Fewer than 30% |
| Orange County | $20 | Fewer than 20% |
| Philadelphia | $25 | Fewer than 10% |
| Phoenix | $20 | Fewer than 30% |
| San Diego | $20 | Fewer than 20% |
| San Francisco | $29 | Fewer than 20% |
| Seattle | $20 | Fewer than 30% |
| Washington, D.C. | $21 | Fewer than 20% |

23.     During and after the time period Uber has made these unsubstantiated earnings claims, in many markets, most Drivers have not made the claimed amount.  In many instances, Drivers have not made the promised amounts even when factoring in non-hourly earnings, such

**COMPLAINT**                                                                                      **PAGE 7**

1   as payments for time-limited promotions and other incentives.  These promotions and incentives

2   often have been contingent on working specific late-night hours, accepting a minimum

3   percentage of trip requests, completing a set number of trip requests within a limited time period,

4   driving in a certain geographic area, or fulfilling other requirements.

5                               **Defendant's Vehicle Solutions Program**

6          24.     Since at least November 2013, Uber has induced consumers to become Uber

7   Drivers by touting its Vehicle Solutions Program through its marketing materials.  Uber has

8   directed prospective and current Drivers interested in the program to specific auto companies,

9   and often to specific employees at auto dealerships.  Uber has entered into contracts with three

10  subprime auto companies to offer auto deals to Uber Drivers as part of the program.  Auto

11  payments are deducted automatically from Drivers' total weekly fares, before any earnings are

12  remitted to the Uber Driver.

13         25.     From November 2013 to April 2015, over 5,000 Drivers entered into deals with

14  one of the three auto companies through Uber's program, with nearly all Drivers entering into

15  that company's four-year "lease-to-own financing option" available only to Uber Drivers.  To

16  participate in this program, Drivers are required to pay at least $1,000 for a down payment and

17  $1,000 for security deposit, which many Drivers have elected to distribute over the lease term.

18         26.     The two other auto companies have financed vehicle sales for Uber Drivers

19  through Uber's Vehicle Solutions Program exclusively using retail installment contracts.  One

20  company participated in the program from November 2013 to May 2015, and the other company

21  participated from November 2013 until at least April 2016.  Drivers first have entered into retail

22  installment contracts to purchase vehicles with the dealerships, and the dealerships have then

23  assigned or transferred the contracts to one of these two finance companies.  Since November

24  2013, one company has funded over 1,500 financing contracts, and the other company has

25  funded over 400 financing contracts for Uber Drivers.

26

27

28

**COMPLAINT**                                                                                    **PAGE 8**

*Defendant's Auto Finance Representations*

27.      Uber has made a number of claims about the terms and conditions of its Vehicle Solutions Program.

28.      For example, Uber has disseminated or caused to be disseminated advertisements touting the low cost of using its Vehicle Solutions Program to obtain a vehicle.  For example, Uber has stated that consumers could "own a car for as little as $20/day" ($140/week); or lease a car with "payments as low as $17 per day" ($119/week), and "starting at $119/week," with the ability to purchase the vehicle for only $1 at the end of the lease period.  Further, Uber has claimed in marketing materials directed at prospective and current Drivers that it "connects drivers with any kind of credit history to the best financing options available."  Uber has described these "financing options" to include financing contracts as well as a "lease-to-own financing option."

29.      Uber also has represented in its marketing material that Drivers opting to lease cars through its Vehicle Solutions Program would have "unlimited miles."

30.      Uber has not had any basis for making these claims.  Uber has not collected, received, or monitored any Driver-specific data regarding the terms of its Vehicle Solutions Program.  Indeed, when Drivers have complained to Uber about the Program, Uber repeatedly has responded with the following or a substantially similar note:

> Please contact your lender to discuss your payments, accruals, or amounts owed[,] as
> Uber does not keep track of this information. The lender indicates your weekly payment
> and we assist the lender in deducting that payment.

31.      Despite the claims that Drivers can make low weekly payments, the median weekly payment for Uber Drivers who entered into a lease from late 2013 through at least April 2015 has been over $200, while the median weekly payment for Uber Drivers who opted to purchase their vehicles through Uber's Vehicle Solutions Program during the same time period has been over $160.  Further, information Uber had at the time it made the claims indicate that the claims are false.  Uber's communications with at least one auto company have acknowledged payment terms and conditions that are inconsistent with Uber's promises to Drivers.

**COMPLAINT**                                                                                    **PAGE 9**

1    32.    And Drivers in Uber's Vehicle Solutions Program – which has connected Drivers

2  with subprime auto companies and dealers – have in many instances received worse interest rates

3  than industry averages, contrary to Uber's promise to connect Drivers with any type of credit

4  history to the best financing available.  Uber's marketing material to dealers has acknowledged

5  that the lease-to-own option was a "one size fits all" product with an "implied APR of 19.5%,"

6  significantly higher than even the industry average interest rates for consumers with deep

7  subprime credit scores.  Additionally, the average rate of  the other auto deals for Uber Drivers

8  has been higher than the industry average for consumers with similar credit scores.  Numerous

9  Drivers who have purchased cars through Uber's Vehicle Solutions Program have received

10  interest rates on their retail installment contracts that are more than double the industry average

11  rate for consumers with similar credit scores.

12    33.    Further, despite Uber's unlimited mileage claims, the leases imposed annual

13  mileage limits of 37,500 and 40,000.  Specifically, Drivers' leases have provided that Drivers

14  who elect to end the leases early, due to any reason including discovering that they are not

15  earning amounts promised by Uber or termination by Uber, and who surrender the car rather than

16  purchase it outright, are obligated to pay an excess mileage charge of $.20 per mile for any

17  mileage over the set limit.

18                    **VIOLATIONS OF THE FTC ACT**

19    34.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts

20  or practices in or affecting commerce."  Misrepresentations or deceptive omissions of material

21  fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

22                         **COUNT I**

23        **Deceptive Income Claims in Violation of Section 5 of the FTC Act**

24    35.    In numerous instances in connection with the advertising, marketing, and

25  promotion of its Driver positions, Defendant has represented, expressly or by implication, that

26  consumers in specific cities are likely to earn substantial income, including specific annual and

27  hourly amounts, as set forth in Paragraphs 19 and 21.

28

**COMPLAINT**                                                        **PAGE 10**

1    36.    In many instances, the representations set forth in Paragraph 35 are false,

2  misleading, or were not substantiated at the time the representations were made.

3    37.    Therefore, the making of the representations as set forth in Paragraph 35 of this

4  Complaint constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act.

5                                  **COUNT II**

6        **Deceptive Auto Finance Claims in Violation of Section 5 of the FTC Act**

7    38.    In numerous instances in connection with the advertising, marketing, and

8  promotion of its Driver positions, Defendant has represented, expressly or by implication, that:

9            a.    consumers  are likely to own or lease a vehicle for an inexpensive daily or

10                weekly amount such as: "Starting at $119/week," "For as little as $20/day," and

11                "For as low as $17 per day;"

12            b.    Defendant connects Drivers with any kind of credit history to the best

13                financing or leasing options available.

14    39.    In many instances, the representations set forth in Paragraph 38 are false,

15  misleading, or were not substantiated at the time the representations were made.

16    40.    Therefore, the making of the representations as set forth in Paragraph 38 of this

17  Complaint constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act.

18                                  **COUNT III**

19      **Deceptive Unlimited Mileage Claims in Violation of Section 5 of the FTC Act**

20    41.    In numerous instances in connection with the advertising, marketing, and

21  promotion of its Driver positions, Defendant has represented, expressly or by implication, that

22  consumers would have "Unlimited Mileage" when leasing a vehicle through Defendant's

23  Vehicle Solutions Program.

24    42.    In many instances, the representations set forth in Paragraph 41 are false,

25  misleading, or were not substantiated at the time the representations were made.

26    43.    Therefore, the making of the representations as set forth in Paragraph 41 of this

27  Complaint constitutes deceptive acts or practices in violation of Section 5(a) of the FTC Act.

28

**COMPLAINT**                                                                    **PAGE 11**

**CONSUMER INJURY**

44.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

**THIS COURT'S POWER TO GRANT RELIEF**

43.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and other such relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, § 53(b), and the Court's own equitable powers, requests that the Court:

A.     Enter such preliminary and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to  preserve the possibility of effective final relief, including, but not limited to, a temporary and preliminary injunction, an evidence preservation order, and expedited discovery;

B.     Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the FTC Act, including, but not limited to, rescission and reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

D.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

**COMPLAINT**                                                                                           **PAGE 12**

1

2

3

Dated: _____1/19/2017_____

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,
David C. Shonka
Acting General Counsel

/s/Katherine Worthman

Katherine Worthman
(Phone: 202-326-2929)
(E-mail: kworthman@ftc.gov)
Ioana Rusu
(Phone: 202-326-2077)
(Email: irusu@ftc.gov)

Attorneys for Plaintiff Federal Trade
Commission

**COMPLAINT**

**PAGE 13**